**Supreme Court**

No. 2012-283-Appeal.
(PC 04-6215)

Deborah Thornley                    :

v.                    :

Community College of Rhode Island et al.    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Deborah Thornley             :

v.                    :

Community College of Rhode Island et al.    :

Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** The plaintiff in this disability discrimination case, Deborah Thornley, appeals from a Superior Court judgment in favor of the defendants, Community College of Rhode Island (CCRI), Anita Creamer, Doris Fournier, and the Board of Governors for Higher Education (collectively defendants). The plaintiff was enrolled in the nursing program at CCRI during the 2003-2004 academic year, while allegedly suffering from chronic headaches, which she treated with the medication Percocet. During the spring semester of 2004, the plaintiff left the nursing program. She subsequently filed a civil action against the defendants, claiming that she had been "dropped" from the nursing program at CCRI because of her disability. The jury, however, after an eleven-day trial reached a verdict for the defendants, finding that the plaintiff had failed to prove that she was disabled.

The plaintiff argues on appeal that the trial justice erred by: (1) admitting into evidence a medical report prepared by a neurologist who treated plaintiff four years after she left CCRI; (2) excusing a juror on the fourth day of trial; and (3) informing the jury that some of plaintiff's claims had been dismissed as a matter of law after the close of evidence. For the reasons set forth below, we affirm the judgment of the Superior Court.

# I

## Facts

The plaintiff filed a complaint against defendants in Superior Court on November 18, 2004, alleging five counts: (1) violation of the Rhode Island Civil Rights Act (RICRA); (2) violation of the Rhode Island Fair Employment Practices Act; (3) intentional infliction of emotional distress; (4) breach of contract; and (5) vicarious liability and/or respondeat superior resulting from Fournier's and Creamer's actions within the scope of their employment by CCRI. The plaintiff's second and fifth claims were dismissed pursuant to defendants' motion for summary judgment; the remaining claims proceeded to trial.

The plaintiff testified at trial that she began suffering from severe headaches in the 1970s or 1980s, for which she sought treatment from numerous doctors. These headaches continued to affect plaintiff through the time of her trial in 2012. According to plaintiff, she was diagnosed with "brain lesions" in 1995 and again in 2002. In 2000, plaintiff was prescribed and began taking Percocet to treat her headaches. The plaintiff testified that, from October 2002 to the fall of 2003, she experienced "pounding" headaches "[a] couple of times a week," with each headache lasting an hour to an hour and a half. During this time period, she also experienced "severe" headaches "[a] couple of times a year," during which she would have to lie on the floor "[b]ecause the pressure on the top of [her] head felt like [her] head was going to explode and [she] started vomiting."

In the fall of 2001, plaintiff was accepted into the nursing program at CCRI. She began her studies in the fall of 2002, with the goal of becoming a Registered Nurse. Approximately halfway through the fall semester of 2002, plaintiff took a leave of absence from the nursing program. According to plaintiff, she told her instructor, Patricia Bosworth, that she suffered

from brain lesions, and her instructor suggested that she withdraw from the program. Bosworth testified, however, that plaintiff told her she had a brain tumor and was experiencing other serious personal issues, and that plaintiff herself made the decision to leave the program.

The plaintiff re-enrolled in the nursing program at CCRI in the fall of 2003, beginning with a course referred to as "Nursing I." Before re-enrolling, plaintiff told Doris Fournier, who was the Department Chair of the nursing department at CCRI, that she had been misdiagnosed, that she did not have a brain tumor, and that she was capable of returning to the program. After receiving passing grades on the first two written exams that semester, plaintiff failed the next two, purportedly because she could not concentrate due to her headaches. The plaintiff discussed her difficulty with her clinical instructor, Donna Ashworth; and, in October 2003, plaintiff informed Ashworth that she was taking Percocet to treat her headaches. Ashworth referred plaintiff to a disability services program at CCRI called the "Access Program."

The plaintiff applied to the Access Program and was given extra time in which to complete her final examination for Nursing I in the fall semester of 2003; she finished the course with a passing grade. The plaintiff began taking the next course in the program, referred to as "Nursing II,"[1] in January 2004, while still reportedly experiencing "pressure" headaches. The plaintiff, not realizing that she had to re-apply to the Access Program each semester, did not request an accommodation for the first written exam in Nursing II, and she failed the test. She then re-applied to the Access Program in order to obtain accommodations for future exams. The plaintiff did not ask for any accommodations for the clinical portion of Nursing II.

---

[1] Both Nursing I and Nursing II consisted of two components: a "theoretical" or "classroom" component; and a "clinical" component, which involved practicing skills in a lab and in real-life clinical settings.

On February 1, 2004, plaintiff telephoned her Nursing II clinical instructor, Anita Creamer, and told her that she had "problems with headaches" and was taking medication. According to Creamer, plaintiff told her she had "a degenerative disease." Creamer asked plaintiff if she had received clearance from her physician to attend the clinical portion of Nursing II, and plaintiff said that she had. The plaintiff testified that her relationship with Creamer became increasingly negative after this conversation; plaintiff felt that Creamer was singling her out and treating her differently from the other students in her class. Creamer testified at trial that plaintiff struggled with the clinical portion of Nursing II; she was anxious, she had difficulty learning the correct method of documentation, she did not always apply concepts learned in Nursing I, and she breached confidentiality and infection-control protocols.

The plaintiff had a meeting with Creamer on February 18, 2004. According to Creamer, plaintiff reported at this meeting that she suffered from various health issues, including an unspecified, life-threatening "autoimmune disease of the brain," hypertension, and nosebleeds. Creamer recalled that plaintiff was unsure whether she should continue with the nursing program due to these health concerns. The plaintiff also told Creamer that she was taking Percocet "every 4 to 6 hours" to treat her chronic headaches. Creamer told plaintiff that she could not take Percocet while participating in the clinical setting unless she obtained medical clearance, because the medication could potentially impact her decision-making and judgment abilities.

A meeting was held on February 23, 2004, among plaintiff, Fournier, Maureen McGarry (the Dean of Health and Rehabilitative Services at CCRI), and Tracy Karasinski (the Director of Access, Mentoring, and Disability Services at CCRI). The plaintiff was told at this meeting that she was not being dismissed from the nursing program, but that she would need medical clearance if she wished to return to her clinical classes while taking Percocet. The plaintiff

testified that she understood that the purpose of this meeting was to try to get her back into school. According to plaintiff, however, discontinuing the use of Percocet was not an option for her at that time. When asked at trial what would have happened if she had stopped taking the medication, plaintiff stated: "My head would feel like it was going to explode. I would be vomiting. I would have to lay [sic] on the floor for hours at a time."

After this meeting, plaintiff did not go back to her clinical class and did not contact CCRI. Instead, she filed a complaint with the Commission for Human Rights on February 26, 2004, alleging disability discrimination. Another meeting was held on March 16, 2004, which plaintiff attended, along with her husband, Creamer, Fournier, and McGarry. During this meeting, McGarry again told plaintiff that she could not return to the clinical class while taking Percocet. Fournier also reiterated, however, that plaintiff was not being dismissed from the nursing program. The meeting ended when plaintiff and her husband left. After this meeting, plaintiff received a letter from McGarry stating that she could contact the Dean of Students if she felt they had not reached a satisfactory resolution. The plaintiff, however, did not make any further attempts to reconcile the issue of her inability to participate in the clinical program while taking Percocet to treat her headaches. She received a midterm grade of "F" for Nursing II and did not attempt to return to the nursing program.

Doctor Jeffrey Wilson, a family physician, testified at trial that he had been treating plaintiff as her primary care physician since November 5, 2003. When he began treating plaintiff, Dr. Wilson obtained from Dr. Lloyd Alderson her medical records, which included multiple MRI results. When Dr. Wilson began seeing plaintiff, Dr. Alderson was prescribing Percocet for her and she was taking up to four pills per day. Doctor Wilson diagnosed plaintiff in November 2003 with a sinus infection and chronic headaches. Doctor Wilson testified that

"Dr. Alderson was the specialist treating the chronic headaches that [in] [Dr. Alderson's] opinion were resulting from the demyelinating[2] issues seen on MRI."[3]  Doctor Wilson agreed that plaintiff's MRI results supported a diagnosis of chronic headaches caused by a demyelinating issue.  Doctor Wilson testified that, in his experience as a doctor, chronic headaches could impair one's ability to work, take care of oneself, and take examinations in school.

Doctor Wilson saw plaintiff sporadically from the fall of 2003 to the summer of 2004, during which time she complained of various ailments including ear pain, leg pain, and throat pain.  On February 27, 2004, plaintiff told Dr. Wilson that she had been "kicked out" of nursing school; however, plaintiff did not request, and Dr. Wilson did not write, a letter to CCRI indicating that plaintiff could perform in a clinical setting while taking Percocet.

Doctor Wilson referred plaintiff to Dr. Gary L'Europa, a neurologist, who rendered a report dated October 6, 2008.  Over plaintiff's objection, Dr. Wilson was permitted to testify at trial regarding Dr. L'Europa's report, and the report was admitted into evidence.  This report contained a section titled "impression," in which Dr. L'Europa wrote that plaintiff's headaches were "Analgesic Rebound Headache[s] secondary to [P]ercocet use."  Because Dr. L'Europa's opinion was that the Percocet use was causing the headaches, he recommended discontinuing the medication.  Doctor Wilson's notes from this time period indicate that plaintiff saw and was

---

[2] Doctor Wilson defined "demyelinating disease" as follows:
> "[A] disease that happens in the brain.  Sometimes in the spinal cord.  Nerves have an insulation around them, the same as electrical wires just outside have an insulation.  The insulation helps nerve impulses travel faster through the nerves.  A demyelinating disease is a disease that attacks that myelin which is the name for the insulation and eats away at it, creating a situation where there is less insulation around the nerve and then the nerves don't work as well.  The impulses don't travel as well or as quickly."

[3] Doctor Alderson did not testify at trial.

dissatisfied with multiple doctors—Dr. Alderson, Dr. Stratton, Dr. L'Europa, and Dr. Johnson. Doctor Wilson also referred plaintiff to Dr. Richard Cervone in 2010, who reviewed her recent MRIs and concluded that there was no neurological explanation for her symptoms.

## II

### Procedural History

After the close of evidence at trial, defendants moved for judgment as a matter of law pursuant to Rule 50 of the Superior Court Rules of Civil Procedure on all three of plaintiff's remaining claims: violation of RICRA; intentional infliction of emotional distress; and breach of contract. Specifically regarding the RICRA claim, defendants argued that plaintiff had failed to prove that she was dismissed from the nursing program and had failed to prove that she suffered from a disability. Before the trial justice rendered her decision on defendants' Rule 50 motion, plaintiff filed a motion for leave to amend her complaint in order to conform to the evidence presented at trial. The trial justice granted defendants' Rule 50 motion but allowed plaintiff leave to amend her complaint; specifically, plaintiff was permitted to amend the factual portion of her complaint and to add a new cause of action for violation of RICRA by constructive discharge.[4] The plaintiff then filed an amended complaint, in which she added a claim for constructive discharge.[5] Before counsel made their closing statements, the trial justice informed the jury that some of the claims in the case had been dismissed as a matter of law.

---

[4] Although the original complaint was, in the words of the trial justice, "not artfully drafted," the parties apparently construed it to have asserted a claim for violation of RICRA by wrongful termination.

[5] The plaintiff also asserted a new version of her previous RICRA claim and reasserted her claims for intentional infliction of emotional distress and breach of contract. During argument regarding the motion to amend, however, the trial justice specifically asked plaintiff's counsel whether the RICRA count was the sole subject of the motion to amend, and counsel replied affirmatively.

The case was submitted to the jury on February 9, 2012, on plaintiff's constructive discharge claim only. That same day, the jury returned a verdict in favor of defendants, finding that plaintiff did not have a disability during the relevant time period. Judgment on the verdict was entered on February 9, 2012. On February 14, 2012, defendants filed a motion for judgment as a matter of law pursuant to Rule 50(b) regarding plaintiff's amended complaint. The plaintiff filed a motion for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure on February 20, 2012. On June 6, 2012, the trial justice issued a bench decision granting defendants' motion for judgment as a matter of law as to the constructive discharge prong of plaintiff's amended RICRA claim, denying plaintiff's motion for a new trial, and ordering plaintiff to pay limited costs. Final judgment for defendants was entered on June 12, 2012.[6] The plaintiff filed a timely notice of appeal.[7]

## III

### Discussion

### A

### Dr. L'Europa's Report

On appeal, plaintiff first argues that the trial justice erred by admitting into evidence the medical report prepared by Dr. L'Europa, as well as the testimony of Dr. Wilson regarding this report. Specifically, plaintiff argues that this evidence was not relevant because it "had no bearing on the reason why [plaintiff] left CCRI in 2004." The plaintiff also contends that the

---

[6] The result of this unusual disposition is that the record contains two final judgments in favor of defendants on plaintiff's constructive discharge claim: judgment on the verdict, which was entered on February 9, 2012; and judgment as a matter of law, which was entered on June 12, 2012.

[7] The plaintiff's notice of appeal purports to appeal the judgment on the jury verdict, the judgment as a matter of law, and the denial of the motion for a new trial. The plaintiff's brief, however, focuses only on alleged errors pertaining to the jury trial.

report should have been excluded pursuant to Rule 403 of the Rhode Island Rules of Evidence because it was unduly prejudicial.

In response, defendants argue that Dr. L'Europa's report was relevant to plaintiff's alleged disability during the fall of 2003 and the spring of 2004, because plaintiff "testified that her headaches were consistent from at least the 1980's to the time of trial in 2012." Moreover, the report contained descriptions of plaintiff's headaches that were similar to the headaches that plaintiff claimed to be experiencing in 2003 and 2004. Thus, defendants assert that the report was relevant because it addressed the potential cause of plaintiff's headaches, as well as the issue of whether plaintiff actually suffered from a neurological condition.

It is well established that "[t]he admission or exclusion of evidence on grounds of relevancy is within the sound discretion of the trial justice * * * ." State v. Lynch, 854 A.2d 1022, 1035 (R.I. 2004) (quoting State v. Calenda, 787 A.2d 1195, 1199 (R.I. 2002)). Thus, "absent a showing of abuse of this discretion, this Court will not disturb a ruling concerning the admissibility of evidence." Id. (quoting Calenda, 787 A.2d at 1199).

Here, plaintiff's cause of action depended on her ability to prove that she was disabled in the fall of 2003 and the spring of 2004, a premise that she ultimately failed to establish. She testified to a long-term, chronic condition of severe headaches, which began decades before her experiences at CCRI and continued through 2012. Rule 401 of the Rhode Island Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Doctor L'Europa's report was relevant to plaintiff's claim of disability because it contained the opinion of a treating neurologist regarding the prevalence and potential causes of plaintiff's headaches. This information, although not reported

until 2008, could easily shed light on plaintiff's condition in 2003 and 2004, especially given the evidence that there had not been any significant change in her headaches after this time period. Thus, the trial justice did not abuse her discretion in admitting into evidence Dr. L'Europa's report and the testimony regarding this report.

As for plaintiff's claimed error under Rule 403, we must reiterate our well-established maxim that "the 'raise-or-waive' rule precludes a litigant from arguing an issue on appeal that has not been articulated at trial." State v. Ford, 56 A.3d 463, 470 (R.I. 2012) (quoting State v. Brown, 9 A.3d 1240, 1245 (R.I. 2010)). Here, plaintiff's counsel objected to the admission of Dr. L'Europa's report on grounds of relevance. At no point during trial did counsel argue that the report was unduly prejudicial; thus, we shall not consider plaintiff's claim on appeal that the admission of Dr. L'Europa's report was in violation of Rule 403.

**B**

**The Excusal of Juror 78**

On the fourth day of trial, a juror (Juror 78) approached the court with concerns about his own experiences in relation to the facts unfolding at trial. Juror 78 informed the trial justice that he had "a bunch of experiences in [his] life that [were] substantially similar to [plaintiff's]," specifically that he had suffered from "a persistent migraine condition" from ages sixteen to twenty-two, including a portion of time when he was in college. This juror also informed the court that his mother-in-law was "a nurse who takes Percocet at night specifically so it doesn't affect her abilities during the day." Additionally, the juror commented on his experience with "faculty hazing" at Bentley University, and noted that this was another parallel between plaintiff's case and his own life experiences. Juror 78 stated: "I don't think I'm biased but I do

think I understand [plaintiff] to a higher degree than the average person." The following exchange took place between Juror 78 and the trial justice:

> "THE COURT: Okay, do you believe that you can keep all of these experiences out of your consideration of this case?
> "JUROR 78: None of it is admissible during deliberations?
> "THE COURT: Your experiences.
> "JUROR 78: Yes, I can do that.
> "THE COURT: It won't influence how you view the evidence, your own personal experiences?
> "JUROR 78: I did try and when we introduced the evidence on the Percocet frequency, I did take a look at it and say well, like my mother-in-law makes sure she fills the prescriptions and kind of stockpiles them basically for times she might need them more than other times so that sort of thing may be --
> "THE COURT: Okay, but you haven't heard any evidence about that?
> "JUROR 78: No, I haven't, not one way or the other.
> "THE COURT: But you're using your experience to [sic] potentially as a lens through which to view this evidence; is that fair?
> "JUROR 78: Yes.
> "THE COURT: And if you're not permitted to do that, do you think you could?
> "JUROR 78: I can, yes. I just, I'm not sure I would know exactly what. That was the logical conclusion to me. I didn't realize I was doing something inappropriate with that one."

After discussing the matter with the attorneys, the trial justice dismissed Juror 78 and selected an alternate to take his place.

The plaintiff argues that the trial justice erred by excusing Juror 78. According to plaintiff, "[t]here was no basis to question the juror's assurance that he could decide the case on the evidence." The plaintiff views this excusal as a "mid-trial peremptory" challenge, in contravention of G.L. 1956 § 9-10-18, which provides for the exercise of peremptory challenges only before the opening of trial. The defendants, for their part, argue that the removal of Juror 78 was not an attempt to use a peremptory challenge in mid-trial; rather, this juror was excused

by the trial justice for cause. The defendants also argue that this issue is waived because plaintiff failed to raise it in her motion for a new trial.

We have previously held that "any arguable legal errors that may have been committed by the trial justice during the course of the trial" must be brought to the attention of the trial justice. Mead v. Papa Razzi, 899 A.2d 437, 445 (R.I. 2006) (emphasis omitted). "It is not necessary, however, to itemize at the Rule 59 juncture each and every non-legal error that counsel believes may have been committed during the trial * * * ." Mead, 899 A.2d at 445. Furthermore, "[i]t is well-settled in this jurisdiction that the issue of whether a juror is disqualified due to bias, prejudice or interest is left to the discretion of the trial justice." State v. Valcourt, 792 A.2d 732, 735 (R.I. 2002) (quoting State v. McDowell, 685 A.2d 252, 255 (R.I. 1996)). Thus, in this context, the issue of whether the trial justice erred in excusing Juror 78 was not an issue of law; rather, it was a matter committed to the sound discretion of the trial justice. See Mead, 899 A.2d at 445. Accordingly, plaintiff did not waive this issue by failing to present it in her motion for a new trial.

As to the merits of plaintiff's argument, however, we disagree. The responsibility for ensuring a fair and impartial trial rests squarely with the trial justice, whether it be in a civil or criminal context. Absent a clear abuse of discretion, we are reluctant to restrain a trial justice's authority to excuse a juror in the midst of trial before, so to speak, "the hurlyburly's done, [w]hen the battle's lost and won."[8]

In the matter under review, the trial justice properly heeded our admonition in Valcourt that "[t]o determine a juror's impartiality, an appropriate in camera inquiry of the juror is necessary." Valcourt, 792 A.2d at 735. The record discloses an extensive in camera discussion

---

[8] William Shakespeare, Macbeth, act 1, scene 1.

with the juror, in the presence of counsel, during which the trial justice asked him questions concerning his ability to separate his background experiences from the facts of the case at hand. After entertaining arguments from counsel, the trial justice expressed her concern that the juror was injecting his own experiences "to fill gaps in the evidence." As an example, she cited the juror's recollection of his mother-in-law's practice of "stockpiling" Percocet. Notwithstanding the juror's avowal that he could remain fair and impartial, the trial justice believed "that he's going to draw extensively on his special experience." Accordingly, she excused him.

We are satisfied that the trial justice was acting well within the parameters of her broad discretionary authority when she excused Juror 78. She conducted an appropriate in camera inquiry, which caused her to conclude that this juror was "using his personal experiences to fill gaps in evidence, not to interpret the evidence that's there but to actually create additional evidence." In our opinion, her concerns were well founded. The juror's references to his mother-in-law's "stockpiling" of Percocet; and to his experience with "faculty hazing" at Bentley University (at which "no one ever gets fired or dismissed. * * * [T]he people at the university * * * simply decide to eliminate a person and they stop talking to them * * * until the person figures out that [he or she] should leave"); and his comment that he thought he understood the plaintiff "to a higher degree than the average person," were sufficient to justify the trial justice's concerns about his objectivity.[9]

---

[9] The plaintiff's final argument on appeal is that the trial justice erred by telling the jury, after the close of the evidence, that some of the claims in the suit had been dismissed as a matter of law. The defendants argue, and plaintiff concedes, that plaintiff's counsel at trial failed to object to the trial justice's statement at the time it was made. As previously noted, our well-established raise-or-waive rule prevents us from considering issues on appeal that have not been preserved below. State v. Ford, 56 A.3d 463, 470 (R.I. 2012).

**IV**

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court.  The record shall be returned to the Superior Court.



**RHODE ISLAND SUPREME COURT CLERK'S OFFICE**

*Clerk's Office Order/Opinion Cover Sheet*

**TITLE OF CASE:**        Deborah Thornley v. Community College of Rhode Island et al.

**CASE NO:**        No. 2012-283-Appeal.
(PC 04-6215)

**COURT:**        Supreme Court

**DATE OPINION FILED:**   November 24, 2014

**JUSTICES:**        Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:**        Chief Justice Paul A. Suttell

**SOURCE OF APPEAL:**    Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Judith C. Savage

**ATTORNEYS ON APPEAL:**

For Plaintiff:  Thomas M. Dickinson, Esq.

For Defendants:  C. Russell Bengtson, Esq.